Filed 2/6/14  In re S.B. CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re S.B. et al., Persons Coming Under the Juvenile Court Law. | B246181 (Los Angeles County Super. Ct. No. CK77749) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. MICHAEL B., Sr., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles, Veronica McBeth, Judge.  (Retired judge of the L.A. Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Stephen D. Watson, Senior Associate County Counsel, for Plaintiff and Respondent.

_____

Michael B., Sr. (Father), the father of S.B. and Michael B., Jr. (Michael), appeals from the juvenile court's order denying his petition under Welfare and Institutions Code[1] section 388 to modify a previous order.  We affirm.

**BACKGROUND**

The family has a long and highly contentious history in juvenile court.  In June 2009, the Department of Children and Family Services (DCFS) filed a petition pursuant to section 300, subdivisions (a), (b), and (j) on behalf of S.B. and Michael, then six and two years old respectively.  The petition alleged that Andrea M. (Mother) struck the children with belts while her boyfriend held them down; Mother and her boyfriend had engaged in mutual domestic violence in front of the children; Mother and her boyfriend had forced the children to lick up spilled liquids, and Mother's boyfriend had tagged gang graffiti on Michael's chin and legs; Mother's boyfriend had cut Michael's left arm with scissors (Father supplied a videotaped interview with the children describing how Michael received the cut and the graffiti); and Mother had told S.B. to lie to authorities about the physical abuse of Michael.  The petition also alleged that Father, who had been in a relationship with Mother for three to four years, had no contact with the children for over a year and a half.  After he reestablished contact in Spring 2009, Father "engage[d] in communication and behavior in the presence of the children that is alienating the child [S.B.] from her mother, causing [S.B.] to decompensate emotionally, to be under considerable stress, and to exhibit psychosomatic symptoms," which endangered S.B.'s and Michael's physical and emotional health and placed Michael and S.B. at risk of emotional and psychological damage.  The juvenile court found that Father was the presumed father of both children.  The court detained the children from Mother (ordering reunification services), and released them to Father (ordering family maintenance services), ordering that Father and Mother were not to discuss the case or mention the other parent in the children's presence, and "[n]o videos or tapes are to be made of what

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

the children say." The children were placed in individual therapy, Mother's visitation was monitored, and her boyfriend was to have no contact with the children.

At the disposition hearing in November and December 2009, the juvenile court concluded that the levels of physical abuse alleged in the petition had not been proven, and sustained as amended the allegations under section 300, subdivisions (b) and (j) to state that "[o]n several occasions" Mother and her boyfriend "inappropriately disciplined the children" causing them unreasonable pain and suffering, and Father "continues to engage in communication and behavior in the presence of the children" which alienated S.B. from Mother, and caused S.B. to decompensate emotionally, experience stress, and exhibit psychosomatic symptoms, endangering both children's physical and emotional health. The court stated that Father's "communication is entirely inappropriate and Mother has been consistently appropriate throughout the case." The court declared the children dependents, removed them from Mother's custody and made a home of parent-father order, and ordered individual counseling for the children (S.B.'s counseling was to address "custody issues and alienation issues"). The court also granted family maintenance services to Father, who was ordered to attend a fatherhood group, individual counseling for anger management, and a parents beyond conflict program. Mother was ordered to attend parenting classes, joint counseling with S.B., and individual counseling, and was to receive reunification services and monitored visitation.

In March 2010, the court liberalized Mother's visitation to unmonitored visits. In May 2010, DCFS's assessment was that the children loved both Mother and Father and wanted them in their lives, although the parents should work on their strained relationship with each other. DCFS recommended family maintenance services for both Mother and Father, with joint custody. Mother received more visitation in June. A status review report filed in July 2010 stated that the children appeared "safe, secure, and comfortable in their mother's home as well as under their father's care," and recommended that Mother continue to receive family reunification services and begin unmonitored overnight visitation.

3

On August 11, 2010, DCFS filed an ex parte application requesting that Mother's visitation revert to monitored. The local police department had made an emergency response referral, stating that it received a report that when the children returned to Father from a day visit to Mother, Michael had a scratch near his right eye and a laceration on his lower lip. Michael told the police that Mother hit him with an open hand when he urinated on the toilet seat. When the social worker saw Michael the next day, he said the same thing; the social worker did not see an abrasion on his lip, and observed a discoloration of the skin under his eye. The juvenile court ordered that visitation be monitored with discretion to liberalize after a full DCFS investigation "to be completed out of the presence of the father," and ordered that Father "not question the children after their visit with Mother, or have anyone else question them."

A status review report filed on September 10, 2010 contained a long interview with paternal grandmother who stated that the social workers lied and were all against Father. When interviewed by a social worker about the August allegation about injury to Michael, Michael said, "it was fake, that he scratched his lip" and S.B. said that it was "made up." On August 31, when Father was told that the referral was being closed as inconclusive and that Mother's visits would once again be unmonitored, he stormed out of the office, cursing and slamming doors. With the children standing at his side, Father yelled at the social worker trying to give him instructions regarding the visits, and threatened: "'When you clock out, I'll be waiting for you.'" He refused to allow a security guard to escort him from the building, so the police were called; the receptionists in the lobby told the police they had not heard any threats, so the police did not make a report. Other children's social worker's (CSW) reported that Father had become angry and agitated during an earlier meeting, and had told one CSW that "he (Father) was a lethal weapon and he could jump across the table and snap his neck," which Father said he should have done to the children's mother.

Father had been attending therapy, where he was respectful and candid. Mother had also attended therapy, where she had appropriately addressed anger issues; and Mother's monitored visitation with the children had gone well, with Mother in tune with

4

the children's emotional needs. Nevertheless, "this is a 'custody battle' and as such should be in Family Law Court. Father is very angry and does not want mother to have the children." Father was very noncompliant, and "has threatened and intimidated every CSW that has had any connection to the case, to the point that CSW[']s are seeking restraining orders against Father." DCFS recommended that Mother begin to have unmonitored overnight and weekend visitation, and that the situation be reexamined in a few months for the possible return of the children to Mother. DCFS also recommended that Father be ordered to attend intensive anger management therapy.

At the six-month review hearing on September 10, 2010, Father's counsel stated that Father wanted the court to place the children with Mother, because DCFS scrutiny was "just too much;" Mother's counsel responded that Father "is trying to bully everyone and he states, 'I will get them.'" The juvenile court noted that Father's behavior towards the social workers and his attitude toward authority had been a concern since the beginning. The court ordered family preservation services for both Mother and Father, and unmonitored overnight and weekend visits for Mother. The court later declined to issue a restraining order against Father, but ordered him to stay away from the CSW whom Father had threatened to "clock."

In December 2010, DCFS filed a status review report describing the children as "torn between visiting with their mother and residing with their father," and wavering about where they wanted to live, appearing anxious and confused. The parents were unable to communicate amicably. Father had been arrested for making a terrorist threat (to his former brother-in-law) and later released. Mother had had a daughter with her boyfriend, who had participated in voluntary family maintenance services with Mother. S.B. had expressed some hesitancy about returning home to Mother if her boyfriend was there; Michael had shown no concern, and DCFS recommended that the boyfriend be allowed to be in the home when the children were present. Visitation with Mother was going well, and DCFS recommended the children be returned to Mother's home, with Father having visitation after school twice a week and alternate weekends. Both children stated they wanted to return to live with Mother.

5

The court held a combined hearing under sections 366.21 subdivision (f) and 366.22, ordering that Mother be referred to family preservation services, and when the services were in place, the children would be released to both parents with a shared custody agreement (with Mother having alternating weeks). In April 2011, the court ordered Evidence Code section 730 evaluations of Father, Mother, and the children, and continued the section 366.22 hearing until the evaluations were complete.

The lengthy evaluation by Dr. Michael Ward, dated June 27, 2011, reported that while both children appeared to be functioning and developing well, each (and especially S.B.) showed emotional distress regarding the case. Both parents were defensive, with father slightly more defensive. The maternal side of the family was much less likely to disparage the other side and more willing to share custody; the paternal side tended to be "rigid, inflexible, intolerant, vitriolic, and overly moralistic and judgmental about others," while the maternal side was much more reasonable. Neither parent posed a risk of physical abuse of the children. "[T]his is much more like a typical Family Law case than a typical Dependency Court case that deals with abuse and/or neglect, with the notable exception of emotional abuse," which the added counts recognized came from Father and his family. The case began with Father's videotaped interview of S.B. Such a "'parental' interview" always raised more questions than provided answers. The children were "all over the place in terms of what they say and depending on whose influence they were under at the time." While Father was not an out-of-control, aggressive man and the children were not physically afraid of him, the children were anxious and fearful of disappointing and losing him. Father and his family had been putting incredible pressure on them, talking about Mother "in greatly exaggerated, inappropriate, and almost vile terms," and "that's the emotional abuse." The evaluation recommended that to put a stop to at least some of the emotional abuse, the children should be placed with Mother, with continued therapy for the parents and the children. This would help the children to stop worrying and allow them "to enjoy what's left of their childhood."

6

**August 31, 2011 order**

The court held a section 364 review hearing for Father, and a section 366.22 hearing for Mother, on August 31, 2011. Dr. Ward testified that he recommended Mother have primary custody, to minimize the likelihood that S.B. and Michael would experience emotional abuse. Mother's counsel argued for primary custody to Mother with regular visitation for Father; Father's counsel argued that Father should retain primary custody and Mother have visitation on alternating weekends, with the children's counsel in agreement; and DCFS recommended home of parents with fifty-fifty shared custody. The court concluded that "50-50 relationships only work . . . from this court and the family law court when the parents are able to get along well and that is not the situation we have here and I do not agree with the department at all in that respect." The court made a home of parents order, with primary custody to Father and both parents sharing legal custody, admonishing Father not to speak negatively about Mother in the children's presence, and giving Mother alternate weekend visits and Wednesday overnight visits. Mother's former boyfriend, now her husband, was allowed to return to Mother's home but could not be left alone with the children, parents and relatives were not to make disparaging remarks, and therapy was to continue.

An interim review report in December 2011 reported that the visitation schedule was going well. Mother had moved into an apartment with her husband, where the children had their own room. A referral in September of general neglect by Mother was substantiated: Mother's husband gave Michael a sparkler to hold, and Michael accidently burned the back of his leg; Mother did not seek medical treatment for the burn. Mother acknowledged that she should not have let Michael hold the sparkler. She stated that it did not appear serious and she put ointment on the burn, but the children returned to Father's home the next day, so she did not have a chance to follow up. The referral was closed as the family was already receiving family maintenance services. Another report in February 2012 indicated that both parents were in compliance with the orders of the court, and that the parents and children remained in individual and family counseling. Both children continued to display emotional distress as a result of attempting to please

both parents, and in-home services were necessary as a result of the continued issues with conflict resolution. Mother "has demonstrated new skills consistent with case plan objectives"; Father "remains in compliance with case plan recommendations and court orders." DCFS continued to recommend that Mother be granted primary custody.

On March 15, 2012, the children's counsel filed a "walk on request" alleging that Michael had injured his head during an altercation between Mother and her husband. On March 29, DCFS informed the court that the referral remained under investigation, and would likely be closed as inconclusive; a team decision making meeting determined that the children were safe in Mother's home pending the investigation, and a safety plan was in place with follow-up visits. The court directed the parties to notify it if there was any substance to the allegation. The section 364 hearing was calendared for May 10, 2012. (An interim review report filed May 10, 2012 advised that the investigation had been closed as inconclusive for physical abuse and unfounded for general neglect, as examination by a doctor on the date of the referral had shown no injuries, swelling, or discoloration to Michael.)

**May 3, 2012 section 388 request**

On May 3, 2012, Father filed a section 388 request to change court order, asking the court to change the August 31, 2011 order (ordering the children to home of parents, with primary custody to Father and joint legal custody with visitation for Mother) by terminating jurisdiction and making the order the exit order. As for what circumstances had changed after the August 31, 2011 order, Father stated that the children had been detained in June 2009, and since then had been residing with Father, where they had "flourished"; Father had adhered to court-ordered visitation, made sure the children went to counseling and medical appointments, and was an active volunteer at school and extracurricular events. Father stated: "Continued court supervision is no longer necessary. We request the court terminate the jurisdiction of the dependency court and maintain the previously ordered custody arrangement as the exit order." This would provide the children with stability after three years of court supervision.

8

DCFS filed an opposition to the section 388 request and continued to recommend return of the children to Mother's care, stating that both children had been interviewed and expressed a desire to stay permanently with Mother.

In September 2012, DCFS filed an interim review report listing more referrals alleging abuse of the children. A July 12, 2012 referral alleging that the children were victims of abuse and neglect by Father was concluded as unfounded (physical abuse and general neglect) and inconclusive (emotional abuse). An August 14, 2012 referral alleging that Michael had been sexually abused by Mother's husband was pending; during the investigation, Father had videotaped the social worker's interview with the children and violated visitation orders. The children's statements about where they wanted to live varied depending upon where they were asked; if asked while at Mother's, they would say her home, and if asked while at Father's they would answer his home. Michael had talked about video recordings and said: "'If we tell people then we'll get in trouble'" and if he didn't say he wanted to live with his father "'then we'll go to like foster home. Is that true?'" S.B. also stated that she had told the social worker she wanted to live with Father "'because of the camera. I only said those things because they were recording.'" The children were guarded and tense when interviewed at Father's home.

An ex parte application stated that when the social worker went to Father's home to interview the children about the sexual abuse allegation, she asked to interview the children privately and Father said that he and others present would leave the house. When the social worker explained that the children did not like to be interviewed with cameras present, Father denied that the children were aware that they were being recorded. Father said the surveillance was for DCFS, as "'99% (of DCFS) does what's better for the mother,'" and all social workers were dishonest. The social worker explained that videorecorded interviews could be perceived as skewed, and asked to interview the children outside the home; Father said no. Before the family left, Father told paternal grandmother to turn on the camera, as the social worker knew it was there. The CSW took a photograph of the camera located on the book case behind a picture

9

frame, and then interviewed the children. Father later stated that there was "more than one camera in the home." The application stated that Mother had agreed to a safety plan to have her husband leave Mother's home during the investigation, and requested that Father "not intimidate or coerce[] the children by use of surveillance," and that all interviews with the children be conducted outside his presence and without surveillance in a neutral setting.

At a hearing on September 12, 2012, the juvenile court informed the parties (with the children outside the courtroom) that in a conversation in the judge's chambers, Michael told the judge that Mother's husband "awakens him at night and takes him outside, pulls his pants down and played with his private parts; [¶] and that he is afraid of him, that their mother won't allow them to lock the door, that was added by [S.B.]. They are very upset. They both cried and said they thought I should know that." The court ordered day visits only in a neutral setting and no contact by Mother's husband.

At a hearing on October 26, 2012, S.B. testified that she did not want Mother to know what she was saying because Mother would get mad. She did not miss Mother and liked living with Father because "he is nice to us." Father never asked about her visits with Mother; she liked visiting Mother. She did not like the overnight visits because Mother's husband "was a little mean to my brother." The court noted that S.B. was "traumatized by this whole situation it is so clear," and "the more you asked, the more she cries." Upon questioning by the court, S.B. stated that she did not like to spend the night at Mother's house because Mother and her husband were always mean and fighting. Michael testified that he loved Mother, his visits were "good," and he wished he could see her more often. At Mother's house, Mother's husband would wake him up at night and "throw[] me in the room." Mother's husband also took him out in the backyard at night and exposed his private parts, which made him "sad . . . [b]ecause you are not suppose to be doing that." Mother and her husband argued and once he saw them throw things.

At the continued hearing on December 5, 2012, a social worker who had been on the case for two years testified that he had seen the children in the homes of both Mother

10

and Father. The children's behavior in Father's home had become more nervous and tense, and they did not want to talk to the social worker. In the home of Mother, the children were more playful but were still guarded. S.B. told the social worker she wanted to live with Mother but did not want Father to know, because he would get upset, and Michael told the social worker that Father told him that if Michael said anything inappropriate, DCFS would take them to a foster home and they would not see Mother and Father again. The social worker recommended the children return to home of Mother, based on the 730 report and his observations. At Father's home, the children were very constricted and almost fearful, making eye contact with Father for approval before answering. At Mother's, Mother was mostly not around when he was talking with the children. The children acted more normal and at ease around Mother, but even there Michael told the social worker that Father told him he records everything that the children say, even in Mother's home. Both Father and Mother bickered and harassed each other. Both children behaved normally with Mother's husband, and Michael was very playful. Father was hard to deal with and aggressive. The social worker had no concerns about the children's safety with Father or with Mother.

At a further continuation on December 13, 2012, emergency response social worker Maryin Quezada testified that in July 2012 she investigated a referral of physical and emotional abuse and general neglect against Father, which alleged that he hit the children and told them they would be placed in the foster care system if they told anyone they wanted to live with Mother. Quezada had interviewed the children at both parents' homes, and they were much more relaxed and childlike at Mother's. In the interview in Mother's home, both children told Quezada in separate interviews that they lied at Father's home about wanting to stay with Father, because they knew there were cameras in the home. Father had also told them if they said they wanted to live with Mother, they would be in foster care and Mother's husband would beat them. S.B. begged Quezada not to interview her at Father's home. Quezada concluded that the referral was unfounded because the statements were inconsistent, although the children were bothered about the cameras.

11

Quezada also responded to the sexual abuse referral regarding Mother's husband. She went to Father's home because the children were there and interviewed them outside of Father's presence, but with the cameras on because Father refused to allow interviews of the children outside the house. S.B. told Quezada that Michael told her about Mother's husband taking Michael outside and asking him to take down his boxer shorts. Michael was uncomfortable and hid behind an ottoman while talking to Quezada, telling her that Mother's husband took him outside in the middle of the night and exposed himself. Quezada did not come to a conclusion about the allegation because "the children's statements could have been coerced inadvertently by the cameras." She made an arrangement with Mother to bring her the children so she could interview them at the DCFS office, but Father refused to allow Mother to take the children during her visitation. At a forensic interview in September, Michael gave more details. When Quezada interviewed him privately at a public library, he denied the allegations. In consultation with her supervisor, Quezada deemed the referral unfounded.

DCFS recommended that the parents share custody and Mother have primary custody. The children's counsel recommended that the court terminate jurisdiction and leave the current order in place, with children in the home of Father with unmonitored day visits with Mother. Mother's counsel recommended that the case be closed and the children be placed with Mother. Father's counsel stated that Father recorded because he had no faith in the department, and recommended that Father retain primary custody, with day visits to Mother.

The juvenile court stated that it had never seen a case in which the children said everything they say would be videorecorded, and "the presence of those cameras in the house and the behaviors that surround it constitute a very serious threat of damage to those children." Neither child was at substantial risk of harm from either parent, but there was more negativity on Father's side. The court's concern was that it could not protect the children in the long term, but "I am going to make a family law order that I think is in their best interests based upon where we are right now in this case." The children needed stability and no more strange adults asking questions; both parents loved

12

the children. Although the court had been concerned about Mother's household, he also saw rigidity in Father, who had been out of the children's lives until the last few years and "does not have the flexibility to nurture these children." The court declined to grant the section 388 request, because it would not be in the children's best interests to make the current order permanent.

Both sides had made unsubstantiated complaints, but the court wanted the children to grow emotionally and mature. They were able to act like children at Mother's house, where "[t]hey have been able to breath[e]." Mother had not been honest about her relationship with her husband, but she had been a good mother when the case began. If any of the charges had been substantiated, "you would never get your children back again," but the court did not believe they were true: "I think these children are under such pressure to make both [of] you feel happy that they will make up any kind of story to do that, and that's not OK for the kids." Noting that the parents would be headed into family law court where a judge might change the order, the court ordered that Mother have primary custody, with Father having overnight visitation every Wednesday and every other weekend, with a holiday schedule to be worked out. The court would then terminate jurisdiction.

At a further hearing on December 19, 2012, the court signed the family law order granting joint physical and legal custody (with primary physical custody to Mother and visitation for Father), and terminated jurisdiction.[2]

## DISCUSSION

Father appeals the denial of his May 3, 2012 section 388 motion, in which he requested that the court change its August 31, 2011 order (which ordered the children to the home of parents, with primary custody to Father and joint legal custody with visitation for Mother) by terminating jurisdiction and making the order the exit order.

---

[2] Father filed his notice of appeal before final judgment, following the December 13 hearing. We granted Father's motion to take additional evidence on appeal, which attached the December 19 order as an exhibit. We grant Father's request that we construe his notice of appeal as having been filed upon entry of the judgment.

13

Section 388 "provides the 'escape mechanism' that . . . must be built into the process to allow the court to consider new information." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)  Section 388, subdivision (a), provides: "Any parent or other person having an interest in a child who is a dependent child of the juvenile court ... or the child himself or herself ... through a properly appointed guardian may, upon grounds of change of circumstance or new evidence, petition the court ... to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court."  When the placement of the minor children is in issue, "the burden of proof is on the moving party to show by a preponderance of the evidence that there is new evidence or that there are changed circumstances that make a change of placement in the best interests of the child." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)  "This determination [is] committed to the sound discretion of the juvenile court, and the trial court's ruling should not be disturbed on appeal unless an abuse of discretion is clearly established." (*Id.* at p. 318.)

Father had the burden to show a legitimate change of circumstances.  His section 388 petition, however, did not allege new evidence or changed circumstances since the order eight months earlier in August 2011 placing the children in the parents' homes, with primary custody to Father and joint legal custody with visitation for Mother.  Father instead argued that the children had flourished *ever since 2009* when they were initially placed with Father.  He makes no argument, and we cannot discern, how circumstances (including his behavior) changed since the order issued in late August 2011.  Even if he had demonstrated a change since the prior order, we see no abuse of discretion in the court's conclusion that Father's proposed change was not in the best interests of the children.  As the lengthy history of the family's DCFS involvement demonstrates, each parent had shown animosity and negativity toward the other, but there was evidence that Father was more negative, rigid, and controlling, and that S.B. and Michael were more relaxed and childlike with Mother.  The juvenile court, noting that none of the more recent referrals alleging abuse had been sustained (and that it did not believe that the allegations against Mother's husband were credible), concluded that both parents could

14

provide safe homes for the children, but that in the home of Mother, the children could "breath[e]" and behave like children. "'"When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court."' [Citation.]" (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 319.) It was not an abuse of discretion to conclude that placement with Mother was in the children's best interests.

## DISPOSITION

The order is affirmed.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


ROTHSCHILD, Acting P. J.


CHANEY, J.